COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)
psp@njlawfirm.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
FRANK J. JANECEK, JR.
CHRISTOPHER COLLINS
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
frankj@rgrdlaw.com
chrisc@rgrdlaw.com
*[Additional counsel appear on signature page.]*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALTAFLO, LLC, Individually and on Behalf of All Others Similarly Situated, | No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| vs. | |
| DUN & BRADSTREET CREDIBILITY CORPORATION; DUN & BRADSTREET CORPORATION; and DUN & BRADSTREET, INC., | |
| Defendants. | DEMAND FOR JURY TRIAL |

Now comes plaintiff Altaflo, LLC ("Plaintiff" or "Altaflo"), with its principal place of business at 23 Wilson Drive in Sparta, New Jersey 07871, individually and on behalf of all others similarly situated, through counsel, and for its class action complaint against defendants Dun & Bradstreet Credibility Corporation ("DBCC"), and Dun & Bradstreet Corporation and Dun & Bradstreet, Inc. (jointly, "D&B"), states and alleges as follows:

## INTRODUCTION

1.      Small businesses are the heart of this nation's economy.  Access to credit is the lifeblood of small businesses.  D&B is the most powerful and prominent reporter on small business credit.  Thus, the truthfulness and accuracy of a small business's D&B credit profile, ratings, and scores are of critical concern to the continued health of the small business.

2.      This class action seeks to remedy the efforts by D&B and DBCC, a marketing and sales company cloaked as "Dun & Bradstreet," to wrongfully exploit information, often false and inaccurate, on D&B's report to sell expensive internet-based credit-on-self products (collectively "CreditBuilder").

3.      D&B enters false and inaccurate information on swaths of small business credit profiles, which it publishes to others and sends to DBCC.  DBCC, in turn, solicits target small businesses, through cold-calling and form correspondence, to purchase CreditBuilder based on the false and inaccurate information, as well as through deceptive and misleading statements which have the capacity to and do

confuse reasonable persons regarding the affiliation of D&B to DBCC and to CreditBuilder. Both D&B and DBCC profit directly from each sale of CreditBuilder.

## PARTIES & JURISDICTION

4.      Plaintiff Altaflo is a New Jersey company.

5.      Defendant DBCC is a Delaware limited liability company with its principal place of business at 22761 Pacific Coast Highway in Malibu, California 90265. At all relevant times, DBCC marketed, solicited, and sold CreditBuilder products in the stream of interstate commerce throughout the state of New Jersey and this judicial district. As such, the exercise of personal jurisdiction by this Court over this defendant is fair and appropriate.

6.      Defendant D&B is a publicly-traded Delaware corporation with its principal place of business at 103 John F. Kennedy Parkway in Short Hills, New Jersey 07078. At all relevant times, D&B licensed, distributed, sold, and published small business credit reports throughout New Jersey and this judicial district. As such, the exercise of personal jurisdiction by this Court over this defendant is fair and appropriate.

7.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §1332(d)(2), because the matter in controversy (exclusive of interest and costs) exceeds the sum of $5,000,000, and this case is a class action in which the members

of the class of plaintiffs are citizens of a state (New Jersey) which is different from one of the defendants (DBCC – California).

8.      This Court is a proper venue pursuant to 28 U.S.C. §1391 because many of the acts and transactions giving rise to this action occurred in this judicial district, the defendants have intentionally availed themselves of this market, and they conduct substantial business here.

## FACTUAL ALLEGATIONS

**The Power of "Dun & Bradstreet"**

9.      The Dun & Bradstreet name has been synonymous with small business credit for over 150 years.   D&B purports to gather information about small businesses from various sources, including public records, payment or trade experience information supplied by vendors, lenders, and other reporting entities, and data reported to D&B by the small businesses themselves.   D&B maintains databases of information about the credit-worthiness of millions of businesses, and D&B assigns various scores to each small business relating to credit-worthiness. D&B then licenses its credit reports to others for use in making business and credit decisions.

10.      Dun & Bradstreet occupies a unique institutional role in American and international business and D&B has a virtual monopoly over small business credit reporting.   Dun & Bradstreet carries the imprimatur of the federal government, which requires a small business to have a D&B-assigned Data Universal Number

System ("DUNS") number in order to apply to do work on a government contract. (A DUNS number is a unique ID recognized, recommended, and often required by global corporations, governments, industry and trade associations.  They are similar to federal tax ID numbers, but only D&B distributes DUNS numbers.   When applying for credit, loans, or government bids, small businesses must submit a DUNS number, which vendors or others use to pull financial and credit information.)

11.     Given the age, size, reputation, and unique importance attached to "Dun & Bradstreet" and D&B's profiles, reports, scores, and ratings, small businesses are understandably sensitive to negative information on their reports or profiles, reductions in their scores and ratings, and alerts regarding their D&B information.

**Dun & Bradstreet's Credit-on-Self Line of Business**

12.     Some years ago, D&B sought to capitalize on the importance given to its reports and small businesses' concerns about monitoring and improving their credit profile.   It developed an internet-based credit-on-self product called Self Awareness Solutions ("SAS"), which was supposed to provide customers with an opportunity to monitor their reports, dispute inaccurate information in their reports, and submit positive information to help improve their scores and ratings.

13.     Although the SAS line of business was profitable, by April 2009, customer criticism had become so vocal that D&B planned "killing off" the products because customer complaints were driving down its internal "Voice of the Customer" score, and dissatisfaction with the products was resulting in high rates of

customer attrition.  Customers complained that D&B was using "high-pressure, bait-and-switch tactics" to sell SAS products, and that the products did not perform as promised.

14.   In order to avoid further scrutiny and litigation over the SAS products – but while continuing to reap profits from the credit-on-self line of business – D&B transferred the rights to sell the product line (which was re-named "CreditBuilder") to a new company, DBCC, in August 2010, for $10 million in cash and annual royalties; a deal estimated at $100 million.

**DBCC Dresses Itself Up as "Dun & Bradstreet"**

15.   D&B granted to DBCC a unique license to use the Dun & Bradstreet name, brand, logo, and trade dress.  DBCC employs these elements, as well as email and website addresses that are similar to D&B email and website addresses: http://www.dandb.com and http://www.dnb.com

          

16.   Although DBCC was created in August 2010, it represents to potential customers that it "help[s] businesses establish their credit with a D&B DUNS number," and that it offers "D&B solutions."  It describes its sales force (which it calls "credit advisors") as "modern day Credit Reporters."

17.     DBCC describes itself as a component of D&B's "legacy" and "another chapter in its long and storied history."  DBCC represents to potential customers that its "roots can be traced back to the beginning of the credit industry."  DBCC further represents: "For over 170 years, millions of businesses have relied on these credit services to pave their path to business success.  By 2010, Dun & Bradstreet Credibility Corp. launched a new chapter in this storied history as the company began to offer products to help businesses monitor, manage and build their credit and credibility.  In that respect, we consider Dun & Bradstreet Credibility Corp. a '175 year-old startup.'"

18.     DBCC represents to potential customers that they should "Protect Your Business Credit with Dun & Bradstreet Credibility – Search Our Database of Over 29 Million Businesses Now."  The database referred to is the D&B database.

19.     DBCC uses marketing materials which bear both a DBCC logo and a D&B logo and makes no distinction between the companies.

20.     DBCC represents to potential customers that "[a]t D&B Credibility Corp., we make over 1.5 million updates to our database on a daily basis.  It could be major transactions like paying vendors or making lease or mortgage payments, but it could also be seemingly smaller transactions like equipment leasing, advertising, shipping packages or underwriting insurance. . . .  With all this information flooding into D&B, it's critical that you keep on top of your profile and

credit score to help ensure you keep your reputation solid . . . ."  D&B makes these updates to its databases, not DBCC.

21.    In sum, DBCC makes representations which confuse, mislead, deceive, or outright misrepresent the affiliation of DBCC to D&B and the affiliation of CreditBuilder to D&B.  DBCC fails to disclose the nature of the relationship between DBCC and D&B and the relationship between CreditBuilder and D&B.  That is, DBCC misleads potential customers with deceptive misrepresentations or omissions which conflate DBCC with D&B or "Dun & Bradstreet" and position CreditBuilder as bearing the sponsorship or approval of D&B or "Dun & Bradstreet."

22.    On February 20, 2014, DBCC sued D&B in the Supreme Court of the State of New York, County of New York.  Although DBCC's complaint is heavily redacted, the unredacted portions allege how critically important the confusion caused by the shared name, logo, trade dress, and conflated websites is to DBCC's business model.  DBCC says these elements "are essential to DBCC's business." For example, as part of the falling out between the two companies, D&B "made significant changes to its [website] links including . . . a pop-up box . . . which ha[s] steered customers away from DBCC," by telling them that they are "Now Leaving D&B."  Previously, there was no such notification, allowing DBCC to profit off potential customers' believing that they were still on D&B's website or on a D&B-affiliated website.  As another example, DBCC alleges that D&B changed its website's search functions.  Previously, when a business name was typed into the

D&B search box, the inquiring party was taken directly to DBCC's website and "presented options for learning more information regarding purchasing D&B COS [credit-on-self] Products." (CreditBuilder is a COS product.) Now, a pop-up "directly interferes with the search flow," according to DBCC.

23. DBCC also misrepresents to potential customers their need for CreditBuilder by telling them that there have been "inquiries" on their profiles, when no such inquiries have been made, and that there is negative information on their reports, when such information either does not exist or is false. Furthermore, DBCC misrepresents to potential customers the capabilities of CreditBuilder by telling them that the product can effectively remove false information from their report and improve their scores.

**D&B Places False Information on Credit Reports to Foster DBCC's Sales of CreditBuilder**

24. One of D&B's credit scores is called the Supplier Evaluation Risk ("SER") Rating, which purports to evaluate the risk to a supplier of doing business with the subject small business. Many large government agencies (*e.g.*, the U.S. Department of Veterans Affairs) and corporations (*e.g.*, Wal-Mart Stores, Inc. ("Wal-Mart")) require that a small business maintain a certain SER Rating to do business with them. (The SER Rating is an integer ranging from 1 to 9, with 1 being the lowest risk and 9 being the highest risk. Wal-Mart, for example, requires a small business to have an SER Rating of, at most, 6.)

25.     D&B artificially raises the SER Ratings of a swath of small businesses, assigning them a rating of 7-9, which indicates "high risk of financial stress," despite the fact that D&B has no basis whatsoever to identify a small business as being so close to financial collapse.  D&B then submits – through a batch communication computer program – these artificial changes in the SER Rating to DBCC.  Then, as part of a marketing and sales campaign designed to position CreditBuilder as the solution to the change in SER Rating, DBCC solicits the swath of small businesses to purchase the product to enable them to improve their SER Rating.

26.     Another one of D&B's scores is called the PAYDEX® Score, which purports to reflect the payment history of a small business and its current re-payment capabilities, as reported by its business associates.  D&B claims it must have at least three reports of trade experiences by a subject small business's associates to prepare a PAYDEX® Score.

27.     D&B issues inaccurate PAYDEX® Scores because it fails to keep accurate and current records of the current re-payment capabilities of swaths of small businesses.  Also, for swaths of small businesses about whom D&B only had two reports of trade experiences, D&B manufactures a third fictitious trade experience so that it can give the subject small business a PAYDEX® Score.  In both cases, D&B transmits via batch computer communication these inaccurate changes to the PAYDEX® Scores to DBCC.  Then, as part of a marketing and sales campaign designed to position CreditBuilder as the solution to a low or inaccurate PAYDEX®

Score, DBCC solicits the swath of small businesses to purchase the product to enable them to improve their PAYDEX® Score.

28.     Another one of D&B's scores is called the Commercial Credit Score, which purports to represent the likelihood of a small business falling delinquent in its payments to its business associates within the next 12 months.

29.     D&B issues inaccurate Commercial Credit Scores because it fails to keep current records of the current financial outlook of swaths of small businesses. D&B submits the inaccurate Commercial Credit Scores to DBCC.  Then, as part of a marketing and sales campaign designed to position CreditBuilder as the solution to a low or inaccurate Commercial Credit Score, DBCC solicits the swath of small businesses to purchase the product to enable them to improve their Commercial Credit Score.

30.     D&B also enters false negative payment experiences on the credit reports of swaths of small businesses.  These entries include "slow pay" entries (that a small business did not pay its bills or service its debts within industry time-frames), "delinquency" entries (that a small business was delinquent in a payment), and "cash account" entries (that a small business was on a cash-basis with a certain vendor). D&B submits the entries of these false negative payment experiences to DBCC. Then, as part of a marketing and sales campaign designed to position CreditBuilder as the solution to a negative payment experience, DBCC solicits the swath of small

businesses and offers CreditBuilder as the way to "repair" the small businesses' credit report.

31.     D&B also enters fictitious "inquiries" into the profiles of swaths of small businesses.  (An "inquiry" means an entity has pulled D&B's report about a small business.)  D&B submits the entries of fictitious inquiries to DBCC.  Then, as part of a marketing and sales campaign designed to position CreditBuilder as a needed response to multiple inquiries, DBCC solicits the small businesses.

32.     Prior to the annual renewal date of a CreditBuilder customer's subscription to the product, D&B manipulates the customer's credit profile in one or more of the foregoing ways to enable DBCC to solicit the customer for renewal.

33.     D&B profits off the sale of each individual CreditBuilder product.

## PLAINTIFF ALTAFLO'S EXPERIENCE

34.     Altaflo is a worldwide provider of high performance fluoropolymer and fluoroplastic tubing and pipe.  The company has been in business since 2006 and has made a substantial profit each year of operation.  It has had credit lines of over $250,000 with multiple vendors, and lines as high as $750,000.  It has never, to its knowledge, been delinquent in making any payments to vendors and has never faced liens or bankruptcy.

35.     In May 2011, Altaflo purchased a CreditBuilder product for $499.00.  Through the product, Altaflo listed several trade references: Daikin America, Reel-Core, and Precision Tools.  But D&B never contacted these references.

36.    When Altaflo confronted D&B about its failure to contact the trade references, it promised to correct the problem and contact the trade references, but only if Altaflo renewed its subscription to CreditBuilder.  In light of this, Altaflo purchased CreditBuilder again in May 2012 for $499.00.

37.    On January 15, 2013, D&B published a "Live Report" about Altaflo which said that there had been a "high number of inquiries to D&B over [the] last 12 months" and that the high number of inquiries was a factor negatively affecting Altaflo's Financial Stress Score.  In truth, many of the inquiries were fictitious (created by D&B itself) or were double-counted (treating a group of requests by the same entity on the same date as multiple inquiries).  Thus, the number of inquiries was inflated and Altaflo's Financial Stress Score was artificially made worse.

38.    On January 15, 2013, Altaflo received notice that D&B had changed the company's Financial Stress Class Score from 3 to 4, the Financial Stress Score from 1462 to 1435, the Commercial Credit Score from 477 to 472, and the Supplier Evaluation Rating from 5 to 7. As a result of those changes, D&B classified Altaflo as a "high risk" of bankruptcy, financial instability, and delinquent bill payment. There was no basis in fact for these changes in score of the risk classification.  There had been no changes in the way Altaflo conducted business.

39.    When Altaflo contacted D&B to ascertain the reasons behind the negative score changes, it was informed that there was a late payment to an air conditioning company on its report.  This entry was false: the only air conditioning

company Altaflo dealt with had been paid in full immediately after services were provided.

40.     Despite multiple attempts to challenge the false negative payment experiences and update outdated credit information reported by D&B, Altaflo was unable to do so using D&B's systems.  But in March 2013, Altaflo received a phone solicitation from DBCC that said it could correct the reports of the false payment experiences and update Altaflo's credit file by purchasing CreditBuilder again, this time for $799.00.

41.     Although Altaflo was promised that CreditBuilder would allow it to learn the identities of the companies supposedly submitting negative payment experiences to D&B, Altaflo was never told who the companies were.  And D&B failed to address the false entries from the undisclosed sources.

42.     D&B has published and continues to publish inaccurate and harmful information about Altaflo's financial condition.  For example, one of Altaflo's largest potential clients, FEI, uses data generated by D&B in its decision-making. On approximately February 18, 2014, Altaflo learned that D&B had published inaccurate information on Altaflo which was relied upon by FEI.  The inaccurate information reported by D&B included a listing that Altaflo maintained only $50,000 in credit lines.  In truth, Altaflo had active credit lines of over $500,000. Based on information and belief, the inaccurate information reported by D&B caused Altaflo to lose out on an opportunity to become a "prime vendor" with FEI.

(As a prime vendor, Altaflo would have been promoted throughout the company's branches across the country, resulting in tremendous sales opportunities.)

## CLASS ALLEGATIONS

43.    This action is brought on behalf of the Plaintiff as well as on behalf of the following class members ("Class Members" or the "Class"), pursuant to Federal Rule of Civil Procedure 23(b)(2)-(3):

All Purchasers of a CreditBuilder Product in the State of New Jersey.

44.    The number of Class Members is so numerous and geographically diverse that their joinder is impracticable.  There are thousands of small businesses within the State of New Jersey that meet the Class definition.

45.    The questions of law and fact arising from the Plaintiff's claims are questions common to each member of the Class, and these common questions predominate over any individual questions.  These common questions include the following:

(a)    Did DBCC's representations or omissions create a likelihood of confusion about the affiliation between itself and CreditBuilder with D&B?

(b)    Were DBCC's representations or omissions about itself, D&B, and CreditBuilder misleading to potential customers, and, if so, was it objectively reasonable to rely on those representations or omissions when a potential customer decided whether to purchase CreditBuilder?

(c)     Did D&B institute a process by which false information was placed on small business credit reports or communicated to DBCC?

(d)     Is the publication of false credit information by D&B defamatory?

(e)     Did D&B breach a duty to report accurate, current, and truthful information owed to small businesses? and

(f)     How does negative information on a small business's credit report impact access to credit?

46.     The Plaintiff's claims are typical of those of the Class Members.  And the Plaintiff will fairly and adequately protect the interests of the Class, and has retained experienced counsel to do so.

47.     This case can easily be managed as a class action because the defendants keep electronic databases containing data about each Class Member, which are readily searchable.  Notice can be sent to virtually every Class Member by their DUNS number.

48.     Given that the damage to individual Class Members would likely be dwarfed by the expense of litigating a claim on an individual basis, a class action is the most efficient way to adjudicate this matter.

49.     In addition, a Class may be certified because: (a) the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members that would establish

incompatible standards of conduct for defendants; (b) the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or (c) defendants have acted or refused to act on grounds generally applicable to the Class thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## COUNT I

### Violation of the New Jersey Consumer Fraud Act
### Against Each Defendant

50.     This cause of action incorporates all of the allegations in the other parts of this complaint.  This cause of action is brought separately against each defendant. This cause of action is brought under the New Jersey Consumer Fraud Act, N.J. Stat. §56:8-1 *et seq.* (the "Act").

51.     The Plaintiff, the Class Members, and the defendants are each "persons" under the Act.

52.     The practices, deceptions, false promises, misrepresentations, and knowing concealments of material fact employed by each defendant, as set forth in this complaint, are unconscionable and constitute unlawful practices.

53.    In addition to other remedies available at law, the Plaintiff and Class Members are entitled a refund of all moneys spent on CreditBuilder, treble damages, attorney's fees, and costs of suit under the Act.

## COUNT II

### Negligent Misrepresentation & Concealment Claim
### Against DBCC

54.    This cause of action incorporates all of the allegations in the other parts of this complaint.  This cause of action is brought against DBCC only.

55.    DBCC knew or should have known that its representations about itself, D&B, and CreditBuilder were likely to mislead members of the Class.

56.    DBCC knew or should have known that its failures to disclose material information about itself, D&B, and CreditBuilder were likely to mislead members of the Class.

57.    Class Members reasonably relied on DBCC's misrepresentations and were ignorant of their concealments in deciding whether to purchase CreditBuilder.

58.    As a direct and proximate result of DBCC's negligent misrepresentation and concealment, Plaintiff and Class Members sustained damages; including money spent purchasing CreditBuilder.

## COUNT III

### Defamation Claim Against D&B

59.    This cause of action incorporates all of the allegations in the other parts of this complaint.  This cause of action is brought against D&B only.

60.     D&B published to third persons false and defamatory matters about the Plaintiff and Class Members.

61.     These publications were unprivileged, and they were made with actual malice.

62.     These publications were defamatory per se in that they contained negative information about the Plaintiff's and Class Members' businesses and creditworthiness.

63.     As a direct and proximate result of D&B's defamation, the Plaintiff and Class Members suffered damages, including general (presumed) damages and actual damages (*e.g*., loss of credit opportunities).

64.     As a further direct and proximate result of D&B's defamation, the Plaintiff and each Class Member purchased CreditBuilder in order to address the false and defamatory information on their credit reports; therefore, each member of the Class incurred the same special damage: the cost of CreditBuilder.

65.     Given D&B's actual malice, the imposition of punitive damages is warranted.

**COUNT IV**

**Negligence Claim Against D&B**

66.     This cause of action incorporates all of the allegations in the other parts of this complaint.  This cause of action is brought against D&B only.

67.    D&B owes a duty to those small businesses upon which it chooses to report to take reasonable steps to verify the accuracy and timeliness of information D&B places on its credit reports and which is used by D&B to give ratings and scores.

68.    D&B breached this duty by failing to undertake reasonable steps in verifying the accuracy and timeliness of information placed on reports and used to give ratings and scores.

69.    As a direct and proximate result of D&B's negligence, the Plaintiff and Class Members have sustained damages; including money spent purchasing CreditBuilder to attempt to remedy the inaccurate and untimely information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against each defendant, including:

A.    Certifying this action as a Class Action, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.    An injunction ordering DBCC to fully disclose the nature of its relationship to D&B in all marketing literature, sales calls, and other forms of solicitation;

C.    An injunction ordering D&B to fully disclose to each Class Member the identities of each person or entity that purportedly made an inquiry or report to

D&B regarding that Class Member and upon which D&B relied in publishing its credit reports and ratings;

  D.  Actual damages in amounts to be proven at the trial of this matter;

  E.  Treble damages as authorized by the Act;

  F.  Attorneys' fees and costs;

  G.  Punitive damages; and

  H.  Pre- and post-judgment interest, as appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  June 20, 2014     COHN LIFLAND PEARLMAN
             HERRMANN & KNOPF LLP
            PETER S. PEARLMAN


              */s/ Peter S. Pearlman*
            PETER S. PEARLMAN

            Park 80 West – Plaza One
            250 Pehle Avenue, Suite 401
            Saddle Brook, NJ  07663
            Telephone:  201/845-9600
            201/845-9423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
FRANK J. JANECEK, JR.
CHRISTOPHER COLLINS
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON
HOLLY W. KIMMEL
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

SHANBERG, STAFFORD & BARTZ
LLP
ROSS E. SHANBERG
19200 Von Karman Avenue, Suite 400
Irvine, CA  92612
Telephone:  949/622-5444
949/622-5448 (fax)

LANDSKRONER • GRIECO •
  MERRIMAN, LLC
JACK LANDSKRONER
DREW LEGANDO
1360 West 9th Street, Suite 200
Cleveland, OH  44113
Telephone:  216/522-9000
216/522-9007 (fax)

Attorneys for Plaintiff and the Class

S:\CptDraft\Consumer\Cpt DBCC-NJ.docx

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)
psp@njlawfirm.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
FRANK J. JANECEK, JR.
CHRISTOPHER COLLINS
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
frankj@rgrdlaw.com
chrisc@rgrdlaw.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ALTAFLO, LLC, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | |
| DUN & BRADSTREET CREDIBILITY CORPORATION; DUN & BRADSTREET CORPORATION; and DUN & BRADSTREET, INC., | ) ) ) ) ) | **CERTIFICATION OF NON-ARBITRABILITY PURSUANT TO L. CIV. R. 201.1** |
| Defendants. | ) ) | |

Peter S. Pearlman, of full age, certifies that pursuant to L. Civ. R. 201.1 the within matter is not arbitrable, being that the Complaint seeks damages that are in an excess of $150,000.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this 20th day of June, 2014.

  *s/ Peter S. Pearlman*  
PETER S. PEARLMAN

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)
psp@njlawfirm.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
FRANK J. JANECEK, JR.
CHRISTOPHER COLLINS
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
frankj@rgrdlaw.com
chrisc@rgrdlaw.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ALTAFLO, LLC, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | |
| DUN & BRADSTREET CREDIBILITY CORPORATION; DUN & BRADSTREET CORPORATION; and DUN & BRADSTREET, INC., | ) ) ) ) ) | **CERTIFICATION PURSUANT TO L. CIV. R. 11.2** |
| Defendants. | ) ) | |

I certify that to the best of my knowledge, the matter in controversy is not currently the subject of one other action pending in this court.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this 20th day of June, 2014,

 _s/ Peter S. Pearlman_
PETER S. PEARLMAN